COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Malveaux and Senior Judge Frank
Argued at Hampton, Virginia

UNPUBLISHED

LENA KATHERINE PULLIN

MEMORANDUM OPINION* BY
v.        Record No. 1117-18-1          JUDGE MARY BENNETT MALVEAUX
                                        OCTOBER 15, 2019
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Joel P. Crowe, Judge

W. McMillan Powers, Assistant Public Defender, for appellant.

Liam A. Curry, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Lena Katherine Pullin ("appellant") was convicted of felony child abuse, in violation of

Code § 18.2-371.1(B).  On appeal, she argues that the trial court erred in denying her motion to

strike and motion to set aside the verdict because the evidence failed to show that she committed an

act or omission that was so gross, wanton, or culpable as to show a reckless disregard for human

life.  For the following reasons, we affirm.

I.  BACKGROUND

On appellate review, we consider the evidence presented at trial in the light most

favorable to the Commonwealth, the prevailing party below, and "accord [it] the benefit of all

inferences fairly deducible from the evidence."  Riner v. Commonwealth, 268 Va. 296, 303

(2004).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In September 2016, P.P., the victim, was fourteen months old. At that time, Tina Blair, P.P.'s grandmother, had legal custody of the child and P.P.'s mother, appellant, had "liberal visitation." Appellant and Blair had arranged for P.P.'s visitation with appellant from Thursday, September 8, 2016, to Sunday, September 11, 2016 at appellant's home in Portsmouth. Blair testified at trial that she bathed P.P. around 6:45 a.m. on the day that the visitation was to begin and did not notice any bruising on the child at that time. She gave P.P. to appellant less than two hours later, between 8:15 a.m. and 8:30 a.m. That same day, appellant sent Blair a text message stating that her blood pressure was high and that she was probably going to have to go to the emergency room. Appellant also stated that P.P. was "being a little fussy" and asked if she could bring P.P. to Blair's house if appellant went to the emergency room. Blair told appellant that she could, but appellant did not bring the child back to Blair's house. Appellant did not send any additional written text messages to Blair for the remainder of the weekend, but "may have sent [Blair] a picture or something."

Around noon on Sunday, September 11, 2016, appellant and her fiancé brought P.P. back to Blair's house in Virginia Beach. Appellant did not tell Blair that P.P. had sustained any injuries or fallen during the weekend.

When P.P. arrived back at Blair's home, Blair could tell that P.P. had been given a bath recently because her hair was wet, so she did not bathe or check P.P.'s body at that time. Blair fed P.P. lunch, and after lunch the child took a three-hour nap. When P.P. woke up, Blair laid her on the floor in a hallway to change her diaper. She did not notice anything unusual about P.P. at that time but testified that the hallway was "a little dark" and that she "[c]ouldn't really see." After that, P.P. got up and played. Blair left the house at 5:00 p.m. to pick up a friend. She left P.P. with her son and daughter-in-law, Joseph and Melissa Pullin, at their nearby home.

Blair collected P.P. from their house at 6:00 p.m. and returned to her home. Blair put P.P. to bed between 6:30 p.m. and 7:00 p.m.

The next day, Monday, September 12, P.P. woke up around 6:30 a.m. At that time, Blair removed P.P.'s diaper and "noticed a little bruise on the side of her butt." When P.P. started to crawl away, Blair saw "purply green" bruises on "her behind and on her back and just a little bit on . . . one leg." She had not seen these bruises when she had bathed P.P. on the morning of September 8 prior to P.P. leaving Blair's home for her visitation with appellant.

Blair called a caseworker with Virginia Beach Child Protective Services ("VBCPS") and then drove P.P. to the Virginia Beach Department of Human Services ("VBDHS").[1] Blair testified that she had not hit or struck P.P. during the period of time when she got the child back from appellant to when she drove her to the VBDHS.

Joseph Pullin testified at trial that on September 11, 2016, Blair brought P.P. to his house and left her there so that he and his wife could watch her for about an hour. He stated that he watched P.P. during the entire time she was at his house. He testified that he did not see her fall, and neither he nor his wife hit P.P. while she was in their home.

Detective B.L. Davis of the Portsmouth Police Department spoke with appellant on November 9, 2016. Appellant told Davis that she was at home with P.P. the entire weekend in question. She stated that her roommate was also present, but was never with the child by herself. Appellant also told the detective that her boyfriend was with them "off and on, but . . . was never there alone with the child." Rather, appellant stated that "she was the only one who had sole care and custody for the whole weekend." When Davis asked appellant "what happened with [P.P.'s] injuries," appellant "abruptly ended the interview."

---

[1] The caseworker had been involved with P.P. since the child's birth and testified that several parties, including Blair and appellant, had attempted to gain custody of the child throughout the child's life.

- 3 -

The Commonwealth introduced several photographs of P.P.'s bruises taken on September 12, 2016, including photographs taken that morning at VBDHS.

Dr. Michelle Clayton, the medical director of the Children's Hospital of the King's Daughters child abuse program, was qualified at trial as an expert in child abuse pediatrics. She testified that on November 1, 2016, she reviewed a report about P.P. that was prepared by Dr. Alex Young, another doctor she supervised. Specifically, Dr. Clayton reviewed the photographs of P.P.'s bruises taken while the child was at VBDHS on the morning of September 12. Neither she nor Dr. Young personally evaluated P.P., and Dr. Clayton completed her evaluation solely on the basis of the photographs. Dr. Clayton described her evaluation as an "investigative consult" that occurred because medical professionals did not have the "opportunity to physically examine the child at the time the injuries occurred." She stated that this evaluation was a "standard practice in [her] field."

In the photographs, Dr. Clayton observed multiple bruises to P.P.'s lower back and extensive bruises to her buttocks. She opined that these injuries occurred "as a result of repetitive blunt force trauma to [P.P.'s] lower back and her buttocks." Dr. Clayton based her conclusion on "the widespread nature of the injuries," noting that there were "multiple bruises in areas that are outside the expected location for accidental injuries" and that the injuries "were quite extensive." Dr. Clayton ascertained that the blunt force trauma was "repetitive" because multiple areas of P.P.'s body were bruised, which indicated that "extensive blunt force trauma [was] applied to multiple body areas to cause these injuries."

Dr. Clayton also testified that the bruises were "linear" and that such bruises could result from "forceful impact with an object that leaves a linear impression mark or just leaves an object outline on the tissue." She stated that she typically saw linear bruising caused by "belts, rulers, [and] toys with a linear edge." However, Dr. Clayton agreed that such items were "just

- 4 -

possibilities" and that she could not "determine from looking at the injuries what object caused them." Dr. Clayton testified that the bruises as depicted in the photographs were fading, meaning that the tissue injuries were "significantly worse" and "likely more widespread" at the time the injuries occurred. In addition, there was likely swelling of the affected body areas and "the impression marks would have been clearer and more widespread."

Dr. Clayton opined that P.P.'s injuries could not have resulted from the child falling from a standing position, tumbling down the stairs, or falling on a toy. In addition, she noted that the injuries could not have resulted from an accidental touching.

Dr. Clayton testified that injuries like those she saw in the photographs could pose a risk of "widespread tissue damage because of the application of blunt force trauma to an extensive body area" and that "any child who has injuries such as these[ ] actually can develop kidney issues as a result if there is enough widespread tissue damage and tissue death." Further, because the bruises in the photographs were fading, Dr. Clayton was "concern[ed] . . . that the injuries were a lot more extensive in the immediate timeframe after their occurrence, and widespread injury certainly can cause . . . long term injury to the child's internal organs." On cross-examination, Dr. Clayton testified that she cannot date a bruise by its appearance and instead dates them by the information provided by a child's caregiver. When asked whether there was no way to tell how old the bruises in the photographs were without such information, Dr. Clayton stated that "for young children generally bruises will often disappear completely several days to a week or more after the injury, but it is not possible to say with clarity how many days it takes for bruises to resolve" and that "it is information from caregivers that gives you the most precise dating information."

Following the Commonwealth's case-in-chief, appellant moved to strike the evidence, and the court denied the motion. Appellant did not present evidence. The court found appellant

guilty of felony child abuse or neglect, in violation of Code § 18.2-371.1(B). The court noted that it found Dr. Clayton's testimony "extremely persuasive" with respect to "the extensive blunt force trauma to multiple areas." Further, the court found Blair and Joseph Pullin's testimony "to be extremely credible" and did not "find that there was any bias that was shown on cross-examination."

Following trial, appellant filed a motion to set aside the verdict. After hearing argument on the motion at the sentencing hearing, the trial court denied the motion. The court again stated that it had found Dr. Clayton "extremely" credible and noted that she testified that "there was extensive blunt force trauma to multiple areas, with multiple blows."

This appeal followed.

## II. ANALYSIS

On appeal, appellant argues that the trial court erred in denying her motions to strike and to set aside the verdict because the evidence was insufficient to prove that her acts or omissions were so gross, wanton, or culpable as to show a reckless disregard for human life.

The motions denied by the trial court challenged the sufficiency of the evidence. See Hawkins v. Commonwealth, 64 Va. App. 650, 654 (2015); McGee v. Commonwealth, 4 Va. App. 317, 321 (1987); see also Code § 8.01-680. When considering the sufficiency of the evidence on appeal, we "'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" White v. Commonwealth, 68 Va. App. 111, 118 (2017) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257 (2003) (en banc)); see also Code § 8.01-680. "[U]nder this familiar standard of review, '[a]n appellate court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Dalton v. Commonwealth, 64 Va. App. 512, 525 (2015) (second alteration in original) (quoting Williams v. Commonwealth, 278 Va. 190, 193

(2009)). "Rather, the relevant question is whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Williams, 278 Va. at 193). In addition, "[t]he credibility of the witnesses and the weight accorded the evidence are matters *solely for the fact finder* who has the opportunity to see and hear that evidence as it is presented." Commonwealth v. Perkins, 295 Va. 323, 328 (2018) (quoting Elliott v. Commonwealth, 277 Va. 457, 462 (2009)). The fact finder is also responsible for determining "what inferences are to be drawn from proved facts," provided that the inferences reasonably flow from those facts. Commonwealth v. Hudson, 265 Va. 505, 514 (2003) (quoting Inge v. Commonwealth, 217 Va. 360, 366 (1976)).

In order to sustain a conviction under Code § 18.2-371.1(B), the accused must have committed a willful act or omission that was "so gross, wanton, and culpable as to show a reckless disregard for human life." Code § 18.2-371.1(B)(1). "[W]hether the statutory requirement [under Code § 18.2-371.1(B)(1)] that the act or omission 'so gross, wanton, and culpable as to show a reckless disregard for human life' has been met turns on whether an injury to the child is likely to occur as a result of the act or omission." Hannon v. Commonwealth, 68 Va. App. 87, 94 (2017); see also Flowers v. Commonwealth, 49 Va. App. 241, 247 (2007) ("[T]o support a conviction for felony child neglect, the Commonwealth must establish that the defendant, through her willful act or omission, created a situation placing the child at risk of actual physical harm."). A willful act "necessarily implies 'knowledge that particular conduct will likely result in injury or illegality.'" Mangano v. Commonwealth, 44 Va. App. 210, 214 (2004) (quoting Ellis v. Commonwealth, 29 Va. App. 548, 554 (1999)). In other words, "[t]he defendant must have been aware that [the] conduct was likely to result in serious injury." Id. at 215.

However, unlike Code § 18.2-371.1(A), which makes it a crime for "[a]ny parent, guardian, or other person responsible for the care of a child" to willfully cause or permit "serious injury to the life or health of such child," subsection (B)(1) of the statute "does not require that a child actually suffer serious injury as a result of a defendant's acts or omissions." Commonwealth v. Duncan, 267 Va. 377, 385 (2004). The language of subsection (B)(1), particularly the absence of an injury requirement and the authorization of a less severe punishment, "demonstrates a legislative intent to prohibit conduct that also has the potential of endangering a child's life." Id. Therefore, the statutory element of "'reckless disregard [for human life]' can be shown by conduct that subjects a child to a substantial risk of serious injury, as well as to a risk of death, because exposure to either type of risk can endanger the child's life." Id.

Applying these principles and viewing the evidence under the applicable standard of review, we conclude that the evidence was sufficient to prove that appellant's acts were so gross, wanton, and culpable as to show a reckless disregard for human life. While appellant argues that the evidence was insufficient because there was no direct evidence of how the bruising occurred or when it occurred, circumstantial evidence tended to prove that P.P.'s injuries were inflicted by appellant while P.P. was in appellant's care. Blair testified that she did not observe bruising on P.P. on the morning of Thursday, September 8. Appellant had P.P. in her care from later that morning until noon on Sunday, September 11. Blair did not notice anything unusual about P.P. that Sunday but did observe bruising on P.P.'s buttocks, back, and leg on the morning of Monday, September 12. Appellant herself told Detective Davis that while her roommate and boyfriend were present at times during her visitation with P.P., neither was ever alone with the child. Rather, appellant stated that she "was the only one who had sole care and custody for the whole weekend." See Christian v. Commonwealth, 221 Va. 1078, 1082 (1981) ("[W]here it

appears that a criminal assault was made upon a child within a particular period of time, evidence which shows that the accused was sole custodian of the child during that period may be sufficient, standing alone, to prove criminal agency."); see also Collado v. Commonwealth, 33 Va. App. 356, 364-65 (2000) (affirming defendant's conviction for child abuse where defendant had sole custody and control of the child during period when child suffered severe brain injury). Further, Dr. Clayton opined that the multiple bruises to P.P.'s lower back and buttocks occurred "as a result of repetitive blunt force trauma to her lower back and her buttocks." She also noted that the bruises were linear, which could "come from forceful impact with an object that leaves a linear impression mark or just leaves an object outline on the tissue." Dr. Clayton stated that she typically saw linear bruising caused by "belts, rulers, [and] toys with a linear edge." She further testified that the bruises as depicted in the photographs were fading, meaning that the tissue injuries were "significantly worse" and likely more widespread at the time the injuries occurred. Dr. Clayton opined that P.P.'s injuries could not have resulted from P.P. accidentally falling or from accidental touching. Here, the evidence was sufficient to demonstrate that while appellant had sole care and custody of P.P. between September 8 and 11, 2016, she inflicted injuries on the child that were not caused by accident but rather by her willful acts.

Appellant also argues that the evidence was insufficient to prove that P.P.'s injuries were "life-threatening." However, as noted above, the statutory element of reckless disregard for human life can be shown by conduct that subjects a child to a substantial risk of serious injury, as well as to a risk of death. Duncan, 267 Va. at 385. Dr. Clayton testified that the injuries P.P. suffered posed a risk of "widespread tissue damage because of the application of blunt force trauma to an extensive body area" and that "any child who has injuries such as these[] actually can develop kidney issues as a result if there is enough widespread tissue damage and tissue death." In addition, because the bruises in the photographs were fading, Dr. Clayton was

"concern[ed] . . . that the injuries were a lot more extensive in the immediate timeframe after their occurrence, and widespread injury certainly can cause . . . long term injury to the child's internal organs." Based on the testimony of Dr. Clayton that P.P.'s injuries created a risk of tissue and long-term organ damage to the child, we conclude that the evidence was sufficient to establish that appellant's acts created a substantial risk of serious injury to P.P.

Viewed in the light most favorable to the Commonwealth, a rational fact finder could have found that appellant inflicted non-accidental injuries on P.P. while the child was in her care and that this conduct exposed the child to a substantial risk of serious injury. Therefore, we conclude that the evidence in the instant case, viewed under the applicable standard of review, was sufficient to prove beyond a reasonable doubt that appellant was guilty of felony child neglect.

III. CONCLUSION

We hold that the trial court did not err in denying appellant's motion to strike and motion to set aside the verdict. Accordingly, we affirm.

<u>Affirmed.</u>