PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Compton, S.J.

COMMONWEALTH OF VIRGINIA

v.  Record No. 031036    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                    March 5, 2004
CARLTON WENDELL DUNCAN

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the Court of Appeals erred in reversing a circuit court's holding that a defendant's acts and omissions in the care of his six-month-old son were "so gross, wanton and culpable as to show a reckless disregard for human life" under former Code § 18.2-371.1.[*]

Carlton W. Duncan was indicted for the criminal abuse and neglect of his son, Carlton W. Duncan, II (Carlton), in violation of what is now Code § 18.2-371.1(B)(1), which states:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

Duncan was convicted of the offense after a bench trial in the Circuit Court of the City of Williamsburg and James City County. The circuit court sentenced Duncan to a term of five years' imprisonment, with four years suspended.

_____

[*] Code § 18.2-371.1 was amended in 2003. Paragraph B of the former statute, under which Duncan was indicted, is now set

Duncan appealed from his conviction to the Court of Appeals.  A panel of that Court reversed the circuit court's judgment and dismissed the indictment in an opinion that was withdrawn when the Court granted the Commonwealth's petition for a rehearing en banc.

On rehearing en banc, the Court reversed Duncan's conviction and dismissed the indictment in an unpublished memorandum opinion, Duncan v. Commonwealth, Record No. 1060-01-1 (April 8, 2003).  The Court held that the "evidence was insufficient, as a matter of law, to prove beyond a reasonable doubt that Duncan's willful acts and omissions in caring for his child were so gross, wanton, and culpable as to show a reckless disregard for human life."  The Commonwealth appeals from the Court of Appeals' judgment.

We will state the evidence in the light most favorable to the Commonwealth, the prevailing party in the circuit court, and will accord the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence.  Zimmerman v. Commonwealth, 266 Va. 384, 386, 585 S.E.2d 538, 539 (2003); Murphy v. Commonwealth, 264 Va. 568, 570, 570 S.E.2d 836, 837 (2002); Commonwealth v. Hill, 264 Va. 541, 543, 570 S.E.2d 805, 806 (2002).  The evidence showed that Jennifer Dansby, Eliza L.

_____

forth in identical language as paragraph (B)(1) in the amended statute.  We will use the current numbering in this opinion.

2

Nemo, and Michelle Cribbs shared a residence in James City County. On June 11, 2000, the three housemates were introduced to Duncan and his six-month-old son, Carlton, through a mutual acquaintance.

The next day, about 3:30 p.m., Dansby returned home from work to find Cribbs and some other friends at the house. Although Carlton also was there, Duncan was not present. Dansby and the other adults took turns holding Carlton, but they did not feed him because there was no baby food or formula in the house.

Nemo arrived at the house later that night and joined the other adults in caring for Carlton. An "impromptu party" soon started as several more friends arrived and began drinking beer and using illegal drugs.

About 10:30 p.m., Duncan arrived at the house with a small bag of marijuana. Duncan's eyes appeared to be "glazed over," and the whites of his eyes were "yellowed" in appearance. After his arrival, Duncan did not feed Carlton or "care for the baby in any way," but began drinking beer.

Around midnight, Carlton became "fussy" and began to cry loudly. Duncan announced that he would "take care of the problem," and he took Carlton into a bedroom.

Nemo was concerned about Carlton's welfare because she perceived a negative tone in Duncan's voice when he said that he

3

would "take care of the problem."  After she entered the bedroom where Duncan and Carlton were located, Duncan went to the kitchen.

Dansby, who was seated in the living room, saw Duncan enter the kitchen.  Dansby heard the refrigerator door being opened and closed, which she thought was "odd" because the refrigerator only contained beer and "wine coolers."  About five minutes later, Dansby saw Duncan leaving the kitchen carrying a baby bottle.

Duncan returned to the bedroom and handed the baby bottle to Nemo.  Duncan then left the room and joined some people on the porch.

Nemo began feeding the contents of the baby bottle to Carlton and returned with him to the living room.  As Nemo, who was still holding Carlton, sat down on a couch, she noticed an unusual odor coming from the bottle.  Both Nemo and Dansby, who were sitting together on the couch, thought that the odor "smelled like alcohol."  They also observed that the liquid in the bottle was a "milky pinkish color."  A friend tasted the liquid inside the bottle and concluded that the liquid contained alcohol.

Dansby went into the kitchen and opened the refrigerator door.  She saw that a bottle of "wine cooler" was missing from the refrigerator, and that an open bottle of "wine cooler" had

4

been placed behind some "bags of trash" on the kitchen counter next to the refrigerator. The liquid inside the "wine cooler" bottle was pink in color and "about three inches" of liquid had been removed from the bottle. Dansby became more concerned, telephoned the police, and placed the baby bottle in a safe location until the police arrived.

Lieutenant Stout and Officer P.A. Nacastro of the James City County Police Department arrived at the house in response to Dansby's telephone call. Lieutenant Stout opened the baby bottle and observed that the liquid inside the bottle was a "milky color" and "smelled like an alcoholic beverage of some type." Officer Nacastro observed that the baby bottle contained a "liquid substance" that was of a "whitish, . . . pinkish color," and that the "wine cooler" bottle contained a liquid that was "pinkish" in color.

According to Officer Nacastro, Duncan's eyes were "very bloodshot," his speech was "slightly mumbled," and "[t]here was an odor of intoxicant about his person." The police officers placed Duncan under arrest and seized both the baby bottle and the bottle of "wine cooler."

A certificate of analysis admitted into evidence indicated that the baby bottle contained a "[c]loudy, pink-ish colored liquid" that had an alcohol content of 2.8% ethyl alcohol by volume. The certificate also reflected test results from an

5

examination of the contents of a 12-ounce bottle labeled "Seagram's Wild Berries Flavored Cooler." These test results showed that the bottle of "wine cooler" contained a "[c]lear, pink liquid" that had an alcohol content of 3.2% ethyl alcohol by volume.

Duncan also testified at the trial. He maintained that Carlton was with him during the entire day of June 12th, 2000, and that earlier in the day, he had fed Carlton some cereal. Duncan testified that about 7:30 p.m., he took Carlton to a friend's house, which was located next to Dansby's residence. Duncan stated that Carlton ate part of a banana and drank some baby formula there. Duncan further testified that he and Carlton left the friend's house about 9:30 p.m., and went next door to Dansby's residence.

Duncan admitted giving Nemo the baby bottle, but denied placing any "wine cooler" into the bottle, and said that he did not know that there was any substance other than milk in the bottle. Duncan conceded that he had drunk "three or four beers" on the night in question.

At the conclusion of the evidence, the circuit court found Duncan guilty of criminal abuse and neglect of his child, as charged in the indictment. In explaining its decision, the circuit court stated:

6

I find that Mr. Duncan is not a believable witness. I reject his testimony as to the explanation. I find the Commonwealth's witnesses . . . to clearly show and prove beyond a reasonable doubt that the defendant took the baby back to the back bedroom . . . , he then is the one who goes to the kitchen area, he comes back with a bottle that has this clear pinkish substance in it, he gives the bottle to Ms. Nemo, then he walks out.

Feeding alcohol to a six-month[-old] baby is clear neglect. Coupled with all the other acts, omissions and commissions that he did, I find the defendant guilty beyond a reasonable doubt of the felony charge.

Duncan appealed to the Court of Appeals, which held that the evidence was insufficient to support his conviction. The Court stated that although "Duncan was negligent in caring for his child" and that "[h]is conduct was inexcusable and cannot be condoned," a finding of negligence was not sufficient to convict Duncan of the felony of child abuse and neglect for which he was indicted. The Court noted that although Duncan had just met the women at Dansby's residence the day before leaving his baby with them, there was no evidence to show that the women were irresponsible, incapable, or unwilling to care for Carlton. The Court further stated that there was no evidence that Carlton was hungry or otherwise in distress during the time that the women cared for him in Duncan's absence.

The Court also observed that "when the baby [later] became fussy and started to cry loudly," Duncan, in spite of his "apparent" intoxicated state, "responded to him" and "took steps

7

to feed him, albeit with a bottle containing a liquid mixture, part of which was wine cooler."  In further explaining its holding, the Court stated:

> Plainly, at some quantitative level, based on the alcoholic content and volume of the liquid ingested, feeding a six-month-old child liquid that contains alcohol would . . . constitute a danger to the child's life.  In this case, however, there was no evidence presented to show that feeding a six-month-old child up to eight ounces of a liquid that is 2.8% ethyl alcohol by volume endangers the child's life.  Such a conclusion would, therefore, have to be based on pure conjecture and speculation, rather than on the evidence or inferences reasonably drawn therefrom.  Hence, we conclude the evidence did not support such a finding beyond a reasonable doubt by the trial court.

On appeal to this Court, the Commonwealth argues that the totality of Duncan's acts and omissions were so gross, wanton, and culpable as to show a reckless disregard for his son's life.  The Commonwealth contends that while Duncan's most culpable act was placing an alcoholic beverage into Carlton's bottle, he also committed other "reckless" acts, such as failing to feed his son for several hours, which demonstrated Duncan's "disregard for his infant son's life."

In response, Duncan argues that the Commonwealth failed to establish that his acts or omissions were "so gross, wanton and culpable as to show a reckless disregard for human life," within the meaning of Code § 18.2-371.1(B)(1).  He asserts that although his actions were "irresponsible and less than what one expects of a parent," he did not endanger Carlton.  Duncan also

8

contends that the evidence was insufficient because there was no expert testimony concerning the amount of "wine cooler" necessary to endanger a child's life or health. Duncan asserts that without such evidence, any claim that Carlton's life was endangered rests on mere conjecture and suspicion.

We consider these arguments under an established standard of review. When a defendant contests the sufficiency of the evidence on appeal, the reviewing court must give the judgment of the circuit court sitting without a jury the same weight as a jury verdict. McCain v. Commonwealth, 261 Va. 483, 492, 545 S.E.2d 541, 547 (2001); Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763 (2001); Hickson v. Commonwealth, 258 Va. 383, 387, 520 S.E.2d 643, 645 (1999). The appellate court has the duty to review the evidence that tends to support the conviction and to uphold the circuit court's judgment unless it is plainly wrong or without evidence to support it. Code § 8.01-680; Jackson v. Commonwealth, 267 Va. 178, 204, 590 S.E.2d 520, 535 (2004); McCain, 261 Va. at 492-93, 545 S.E.2d at 547; Tarpley, 261 Va. at 256, 542 S.E.2d at 763.

We have not previously had occasion to address the elements of the crime of child abuse and neglect set forth in the language of what is now Code § 18.2-371.1(B)(1). Initially, we agree with the Court of Appeals' observation that the statutory language does not apply to acts of simple negligence. We base

9

our conclusion on the express language of the statute prohibiting "willful act[s] or omission[s] . . . so gross, wanton and culpable as to show a reckless disregard for human life."  Id.; see also Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992); Davis v. Commonwealth, 230 Va. 201, 206, 335 S.E.2d 375, 378 (1985); Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938); Ellis v. Commonwealth, 29 Va. App. 548, 555, 513 S.E.2d 453, 457 (1999).

The statutory requirement that such conduct be "willful" means that the conduct must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose.  See Bryan v. United States, 524 U.S. 184, 191-92 (1998); United States v. Murdock, 290 U.S. 389, 394-95 (1933); Ellis, 29 Va. App. at 554, 513 S.E.2d at 456.  Thus, the term "willful," as used in Code § 18.2-371.1(B)(1), contemplates an intentional, purposeful act or omission in the care of a child by one responsible for such child's care.

Unlike Code § 18.2-371.1(A), the plain language of Code § 18.2-371.1(B)(1) does not require that a child actually suffer serious injury as a result of a defendant's acts or omissions. The absence of an injury requirement in subsection (B)(1) reflects the lesser nature of the offense, a Class 6 felony, and

10

demonstrates a legislative intent to prohibit conduct that also has the potential of endangering a child's life.

Notably, subsection (B)(1) does not limit the prohibited conduct to acts and omissions that subject a child to an actual risk of death, but proscribes conduct that is so "gross, wanton and culpable" as to demonstrate a "reckless disregard" for the child's life.  Id.  Therefore, we hold that such "reckless disregard" can be shown by conduct that subjects a child to a substantial risk of serious injury, as well as to a risk of death, because exposure to either type of risk can endanger the child's life.

Applying these principles, we disagree with the Court of Appeals' conclusion that the evidence was insufficient to support Duncan's conviction.  We examine the totality of the evidence, and do not limit our review of the record to Duncan's act of placing "wine cooler" in the baby bottle for Carlton's consumption.  Viewed in the light most favorable to the Commonwealth, this evidence showed that Duncan left his infant son for several hours with people he barely knew, and that he did not give them any food or formula to ensure that the baby would be fed.  As a result, Carlton did not receive any food or liquids for more than seven hours.

After returning to the house, Duncan did not attend to Carlton but joined a group of people who were drinking alcohol

11

and using illegal drugs. Duncan appeared impaired and his eyes were "glazed over." When Carlton started crying, Duncan poured an alcoholic beverage into Carlton's bottle and handed the bottle to an acquaintance for her to feed to Carlton.

In addition, the circuit court found that Duncan was not a "believable witness," and directly rejected his explanation of the events in question. As finder of fact, the circuit court was entitled to infer that Duncan was lying to conceal his guilt. See Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001); Dowden v. Commonwealth, 260 Va. 459, 469, 536 S.E.2d 437, 442 (2000); Phan v. Commonwealth, 258 Va. 506, 511, 521 S.E.2d 282, 284 (1999).

The above record demonstrates a pattern of neglect over an extended period that ended in Duncan's knowing and reckless decision to feed an alcoholic beverage to his baby who had been deprived of food and hydration for several hours. Thus, we conclude that the record contains sufficient evidence to support the circuit court's determination that Duncan's acts and omissions were willful and, considered as a whole, were so gross, wanton, and culpable as to demonstrate a reckless disregard for Carlton's life.

Contrary to Duncan's contention, the Commonwealth was not required to produce expert testimony showing that consumption of alcohol by a six-month-old baby who had not had any food or

liquids for at least seven hours presented a substantial risk of serious injury or risk of death to the baby.  Based on the evidence presented, the dangers inherent in such a situation could be inferred by the fact finder as a matter of common knowledge.  Therefore, we hold that the Court of Appeals erred in concluding that the evidence was insufficient to support Duncan's conviction.

For these reasons, we will reverse the judgment of the Court of Appeals and reinstate Duncan's conviction in accordance with the circuit court's judgment order.

<u>Reversed and final judgment.</u>