COURT OF APPEALS OF VIRGINIA


Present:   Judges Annunziata, Humphreys and McClanahan
Argued at Richmond, Virginia


DANYEL LORENZO GRAY, S/K/A
 DANYELL GRAY
                                                    MEMORANDUM OPINION* BY
v.        Record No. 2720-02-2            JUDGE ELIZABETH A. McCLANAHAN
                                                         APRIL 13, 2004
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
                            James F. D'Alton, Jr., Judge

              John H. Cobb, Jr., Public Defender (Office of the Public Defender,
              on brief), for appellant.

              Donald E. Jeffrey, III, Assistant Attorney General (Jerry W. Kilgore,
              Attorney General, on brief), for appellee.


       Danyel Lorenzo Gray appeals his conviction for felony child abuse.  Gray was charged

with Class 4 felony child abuse, a violation of Code § 18.2-371.1(A), but was convicted of Class

6 felony child abuse in violation of Code § 18.2-371.1(B).[1]  Gray contends that the trial court

erred in holding the evidence sufficient to find him guilty of Class 6 felony child abuse.  We

disagree.

                                    I.  BACKGROUND

       When reviewing sufficiency arguments on appeal, we review the evidence and the

inferences fairly deducible from that evidence in the light most favorable to the Commonwealth.

Snow v. Commonwealth, 33 Va. App. 766, 774, 537 S.E.2d 6, 10 (2000).  We will not disturb

_____

       *Pursuant to Code § 17.1-413, this opinion is not designated for publication.

       [1] Code § 18.2-371.1(B) was renumbered as Code § 18.2-371.1(B)(1) by the General
Assembly in 2003, after appellant was convicted.  We refer to the subsection as it was numbered
at the time of appellant's conviction.  The language in the subsection remains the same.

the fact finder's verdict unless that decision was plainly wrong or without evidence to support it. See Ashby v. Commonwealth, 33 Va. App. 540, 548, 535 S.E.2d 182, 187 (2000).

In December 2001, Gray was responsible for taking care of his fourteen-month-old son. Gray and the baby's mother were estranged, but had agreed that Gray would take custody of the child at Gray's mother's house for a few weeks. On December 30, 2001, the baby's mother telephoned Gray and heard the baby crying in the background. She asked why the baby was crying, but Gray would not answer her. After several calls, Gray finally told the baby's mother that the infant "had got[ten] in a tub of water by himself." When the mother went to the house to retrieve her son, she found out that he had been taken to the hospital.

When the mother arrived at the hospital, Gray told her that "he didn't do it." He reiterated that the baby had climbed into the tub by himself. When the mother first saw the baby at the hospital, she described his feet as "big" and "burn[ed]."

Tracie Hilliard-Eppes, a registered nurse who was working at the hospital that day, testified that when the baby was brought into the hospital, the soles of his feet were "very red." Gray also told Hilliard-Eppes that the baby had climbed into the tub, "apparently unobserved." She testified that the injuries appeared consistent with burns, but that she "didn't feel comfortable with" Gray's explanation. Hilliard-Eppes said that the burns were "pretty clean-cut." She explained that a person's natural reaction to touching hot water is to pull back, which creates splash marks. She testified that the baby did not have splash marks up his leg; he only had burns on the soles of the feet. She opined that the burns were first-degree, comparable to sunburn.

Petersburg police officer Will Mayer spoke with Gray in the emergency room. Gray initially told Mayer that he had run some water in the tub and that, when he was in the kitchen cooking, the baby got away from him and climbed into the tub. When he heard the baby crying

he went into the bathroom, saw that the baby had red feet and called the EMS. After talking to the nurses, Mayer conducted further investigation and learned from the baby's mother that the baby was not able to climb into the tub.

At that point, the police read Gray a statement of his Miranda rights. Gray then changed his story and told Mayer, "The baby had been sick all night, and that he had the runs and he was dirty. He placed the baby in the tub and did not check the temperature of the water." He also told Mayer that the cold water connection was not working and that he only had access to hot water. Gray said that he placed the baby into the tub and that when the baby started to scream and cry he pulled him out.

After some time, Gray provided Mayer yet a third story. He stated he wanted "to make things right." "He said that the baby had been sick and crying all night long. He didn't get any sleep and was mad the whole day. He said that he began to cook chicken, and the baby had on a dirty diaper. He said that the fecal matter was coming out of the diaper and the baby was dirty." Gray also said "he was already mad about not getting rest, so he decided to teach the baby a lesson. He turned on the hot water and placed the infant in the hot water and went back to cooking the chicken." He said, "after about five to ten minutes he couldn't stand to hear the baby screaming and crying anymore." Gray told Mayer he removed the baby from the water and noticed that his feet were red and swollen. "He got scared and called the EMS." Gray then made a written statement that was consistent with his third story, which was notarized by a magistrate.

The trial court found Gray guilty of child abuse under Code § 18.2-371.1. At the sentencing hearing, the Commonwealth recommended that Gray be punished for Class 6 felony child abuse because he exhibited a reckless disregard for human life. The Commonwealth contended that Gray would have had to know that the baby would be burned if he immersed him

in hot water for five to ten minutes. Gray admitted he wanted to "teach it [the baby] a lesson." Gray's counsel argued that the indictment had charged Gray with Class 4 child abuse. He stated that the reckless disregard for human life standard would change the nature and character of the indictment. The judge found that the totality of the evidence, including Gray's statement about why he put the baby in the tub, constituted a Class 6 felony. Gray was sentenced to five years in the penitentiary with four years, six months suspended conditioned on, inter alia, good behavior and indefinite probation.

## II. ANALYSIS

Gray argues that the instant case is only one of infliction of injury and the evidence is not sufficient to show that his acts rose to the level of reckless disregard for human life. He contends that because he called EMS when he noticed that the baby's feet were red, any finding of conduct that is "so gross, wanton and culpable as to show a reckless disregard for human life" is negated. However, there is ample evidence in the record to support the trial court's determination that Gray was guilty of acts so gross, wanton, and culpable as to show a reckless disregard for the life of his son.

Code § 18.2-371.1 defines and establishes penalties for abuse and neglect of children. At the time of Gray's conviction, subsection (A) provided in pertinent part:

> Any parent . . . responsible for the care of a child . . . who by willful act or omission . . . causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony. For purposes of this subsection, "serious injury" shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming . . . .

At the time of Gray's conviction, subsection (B) provided in pertinent part:

> Any parent . . . responsible for the care of a child . . . whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

To convict under subsection (A), the Commonwealth must prove that by a willful act or omission, a parent has caused or permitted a serious injury to the child. Under subsection (B), the Commonwealth does not have to prove that a child actually suffered a serious injury, but that the parent had engaged in a willful act or omission that is so gross, wanton and culpable as to show reckless disregard for the child's life. The Virginia Supreme Court has recently stated that subsection (B) demonstrates a legislative intent to prohibit conduct that "has the potential of endangering a child's life." Commonwealth v. Duncan, ___ Va. ___, ___, 593 S.E.2d 210, ___ (2004).

> The statutory requirement that such conduct be "willful" means that the conduct must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose. Thus, the term "willful," as used in Code § 18.2-371.1(B)[], contemplates an intentional, purposeful act or omission in the care of a child by one responsible for such child's care.
>
>     \*      \*      \*      \*      \*      \*      \*
>
> Notably, subsection (B)[] does not limit the prohibited conduct to acts and omissions that subject a child to an actual risk of death, but proscribes conduct that is so "gross, wanton and culpable" as to demonstrate a "reckless disregard" for the child's life. Therefore, we hold that such "reckless disregard" can be shown by conduct that subjects a child to a substantial risk of serious injury, as well as to a risk of death, because exposure to either type of risk can endanger the child's life.

Id. (citations omitted).

Gray's own admission clearly shows that he purposely and willfully acted to inflict injury upon his son. In his statement to the police, Gray said, "the baby had been sick and crying all night long." He admitted that he "didn't get any sleep and was mad the whole day." He said that he "was already mad about not getting rest, so he decided to teach the baby a lesson." He "turned on the hot water and placed the infant in the hot water and went back to cooking the chicken." Gray left the baby screaming for five to ten minutes and only retrieved the baby from

the tub because he "couldn't stand to hear the baby screaming and crying anymore." Placing a fourteen-month-old baby into hot water "to teach the baby a lesson" is a gross, wanton and culpable act. Gray calculated that putting the baby into hot water would burn him – and that is why he did it, according to his own admission. There is certainly sufficient evidence for the fact finder to infer that Gray had the knowledge that these actions would likely result in substantial risk of serious injury to the child.

### III. CONCLUSION

The evidence was sufficient for the trial court to find that Gray willfully, wantonly and culpably inflicted serious injury on his son such that he demonstrated a reckless disregard for human life and, therefore, convict him of Class 6 felony child abuse under Code § 18.2-371.1(B).

<u>Affirmed.</u>