COURT OF APPEALS OF VIRGINIA

Present:    Judges Huff, O'Brien and Senior Judge Frank
Argued by teleconference

MARIA ISABEL ASTUDILLO

MEMORANDUM OPINION[*] BY
v.       Record No. 0713-19-1          JUDGE MARY GRACE O'BRIEN
                                                        APRIL 21, 2020
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Randall D. Smith, Judge

James O. Broccoletti (Randall J. Leeman, Jr.; Zoby, Broccoletti &
Normile, P.C., on brief), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Maria Isabel Astudillo ("appellant") appeals her conviction for child abuse, in violation of

Code § 18.2-371.1(B)(1), following a bench trial.  Appellant contends the evidence was insufficient

to prove that she "acted willfully without a justifiable excuse, and in a manner that was so gross,

wanton, and culpable so as to show a reckless disregard for her child's life."  Finding no error, we

affirm the conviction.

## BACKGROUND

On May 14, 2018, appellant's son, V.A.,[1] was an eleven-year-old sixth grader.  When V.A.

came home from school that day, appellant told him, "[I]f you don't finish your homework in

[fifteen] or [twenty] minutes, I'm going to beat you."  V.A. had "double the usual amount of

homework" and did not finish it in time.  He stated that appellant came in the den where he was

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We refer to the child by his initials to protect his privacy.

working, "made [him] get up," and "whipped [him] with [a] belt," striking him repeatedly. Appellant aimed for V.A.'s buttocks, but some of the blows landed on his "back and legs" and "front side" because V.A. moved to try to avoid the belt.

Appellant gave V.A. another time limit to complete his homework. V.A. did not finish due to the amount of homework and because he was "thinking about [her] and what [was] going to happen." V.A. testified that he was considering whether to "do something to defend myself or just take it." When the time expired, appellant returned to the den and "whipped [V.A.] more." Appellant again used a belt and struck V.A. on his "front side" and "lower back." After this second incident, appellant's conduct became "more extreme and more out of hand." According to V.A., "[i]t turned into a cycle of it happening again."

At one point, appellant tried to "corner [V.A.] and give [him] a bear hug." She told V.A. that "[e]verything stupid you do helps me out in court," referring to a custody dispute she was having with her parents. V.A. attempted to escape appellant's grip, and she "started to wrestle [him] and [pin] him on the ground." V.A. grabbed appellant's legs and neck and "pulled[ed] the back of her knee up" to defend himself. V.A. testified that appellant grabbed the hood of his sweatshirt, "rotated it around," and "twist[ed] it so [his] neck was smaller and smaller, tighter and tighter." He explained that he was having trouble breathing and thought he would "black out." V.A.'s nose started bleeding, and he testified that appellant mistook his blood for tears and said, "Oh, is the little baby crying?" Later, appellant came in the bathroom while V.A. was showering and continued to mock him.

Appellant subsequently took V.A. with her to pick up pizza. He testified that he had blood on his face and arms and was crying, but appellant threatened to "beat [him] more" if he alerted the neighbors.

V.A. also testified that when he got in bed that night, appellant entered the bedroom and "started to whip [him] with the belt in her hand with the lights off." He stated,

> I dodged it sometimes, but then [the blows] were hitting me sometimes, and I was running around the bed, and she turned on the lights and jumped on the bed. I was on the floor, but I was on my feet, and I was trying to dodge her with the belt, and then she was on top of the bed. I didn't know what she was going to do. I was afraid that she was going to jump down from the bed and try to pin me down on the ground.

As V.A. dodged and grabbed the belt, appellant "still tried to hit [him]." V.A. testified, "At some point, it just ended, . . . and the next morning, she was acting like nothing happened."

The next day, while waiting for the school bus, V.A. saw appellant's sister, Natalia Astudillo-Stuckey. Because V.A. "seem[ed] different" and was acting subdued, Natalia "pushed" him to talk. He told her about the incident and took off his shirt. Natalia "saw markings on his chest, front and back, arms, back, neck, front of neck, and . . . on his waist, bruise lines." Natalia described the marks as "red raised welts on his body, long strips." She called the police. The responding officer saw "some bruises or abrasions on [V.A.'s] arms, his stomach, back, [and] redness around his neck." He testified that V.A. described "being wrestled to the ground and being beat [sic] with a belt about [sixteen] times." Photographs of V.A.'s injuries were admitted at trial.

On cross-examination, V.A. acknowledged behavioral issues at school, including a "one-day in-school suspension for using obscene and inappropriate language or gestures." He admitted threatening appellant with a pencil, after which she made him do his homework in crayon, but testified that he raised his pencil "because she was whipping me and hitting me, and it was really painful, and I wanted her to stop." V.A. testified that "pretty much this has been going on my entire childhood." He also stated that appellant and his grandparents were engaged in a custody dispute and that he would prefer to live with his grandparents.

Appellant testified and acknowledged the ongoing custody dispute with her parents. She stated that she had received three phone calls in a week from V.A.'s teacher concerning his disruptive behavior at school, including a call the morning of the incident. Appellant testified that the discipline reports were on her mind when she was instructing V.A. to do his homework.

Appellant explained that she set a timer and gave V.A. thirty minutes to complete his math homework. When he did not complete the homework, appellant "told him to stand up, and [she] corporal punished him with a belt," striking him on his buttocks over his jeans. She admitted hitting him three times with "the soft part" of a belt.

Appellant then told V.A. he had twenty minutes to complete his math homework. She testified that V.A. said, "I hate you," and she responded, "I hate you too, son." V.A. told her to "burn in hell," and appellant responded, "Right after you, son. Sit down and do your homework." Appellant returned after twenty minutes, saw that V.A. had not completed the homework, and instructed him to stand up and turn around so she could discipline him with her belt. Appellant explained that her parents disciplined her this way while growing up.

Appellant referred to this second episode as "Round 2" and admitted that "[t]his went on three or four times, the discipline, [twenty] minutes, discipline, [twenty] minutes." She acknowledged that although she aimed for his buttocks, V.A. moved and she "possib[ly] caught him somewhere else." Appellant testified that V.A. threatened her with a pencil, which she broke, giving him crayons to use instead. Appellant stated that when she returned to "deliver punishment because he wouldn't do [his homework]," V.A. "charged at [her]" and "took [her] off [her] feet." Appellant testified that she landed on the floor beneath V.A. and pulled at his clothing from the back until he finally "eased up." She claimed they stood up at that point and "there was no more physical anything."

Three other witnesses testified on appellant's behalf. A jail healthcare provider, who performed a routine medical screening upon appellant's arrest, noted bruises on appellant's leg and shoulder, as well as a finger scratch, but did not refer her for treatment. Another witness stated that she had observed appellant respond to V.A.'s defiance by talking to him and without physical violence. The third witness testified that although appellant had a reputation for truthfulness, she would not be surprised to learn that V.A. "was struck with a belt [twelve] times," because the witness was aware that appellant "put her hands" on V.A.

After the conclusion of the case, the court found V.A. credible and noted that appellant's testimony substantially corroborated his account of events. The court found appellant guilty of child abuse. In reaching this decision, the court stated,

> [T]he conduct here involved continuing to strike the victim with a belt even when the victim had moved, and although it might have been the original intent of [appellant] to place those blows on his buttocks, it did strike other parts of his body, and she continued to employ those strikes.

The court dismissed a strangulation charge, finding that although the evidence presented a "close situation," V.A.'s injuries were "the result of the struggle that was going on and not an intentional act to impede the circulation and respiration."

## ANALYSIS

When reviewing the "sufficiency of the evidence to support the conviction, the relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Sullivan v. Commonwealth, 280 Va. 672, 676 (2010). Appellate courts will defer to findings of fact "if there is evidence to support them and will not set a judgment aside unless it appears from the evidence that the judgment is plainly wrong." Id. See Code § 8.01-680. We grant the "judgment of a trial court sitting without a jury . . . the same weight as a jury verdict." Myrick v.

Commonwealth, 13 Va. App. 333, 339 (1991). "The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." Ragland v. Commonwealth, 67 Va. App. 519, 529-30 (2017).

Appellant was convicted of violating Code § 18.2-371.1(B)(1), which provides as follows:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony.

She contends the court erred by finding that her actions met the statutory standard of "so gross, wanton, and culpable as to show a reckless disregard for human life." Code § 18.2-371.1(B)(1). Appellant also asserts the court erred by finding that her actions were "willful" under the statute; instead, relying on language in Commonwealth v. Duncan, 267 Va. 377 (2004), she argues that the evidence demonstrated a "justifiable excuse" for her conduct because she was disciplining her son.

To affirm a conviction under the statute, we must determine whether the evidence was sufficient to prove "that [appellant], through her willful act or omission, created a situation placing the child at risk of actual physical harm." Flowers v. Commonwealth, 49 Va. App. 241, 247 (2007). Unlike Code § 18.2-371.1(A) which prohibits "[a]ny parent, guardian, or other person responsible for the care of a child" from willfully permitting "serious injury to the life or health of such child," subsection (B)(1) of the statute "does not require that a child actually suffer serious injury as a result of a defendant's acts or omissions." Duncan, 267 Va. at 385. "[T]he absence of any injury requirement . . . 'demonstrates a legislative intent to prohibit conduct that also has the *potential* for [sic] endangering a child's life.'" Jones v. Commonwealth, 46 Va. App. 713, 718 (2005) (quoting Duncan, 267 Va. at 385).

Code § 18.2-371.1(B)(1) is not limited "to acts and omissions that subject a child to an actual risk of death, but proscribes conduct that is so 'gross, wanton[,] and culpable' as to demonstrate a 'reckless disregard' for the child's life." Duncan, 267 Va. at 385 (quoting Code

§ 18.2-371.1(B)(1)). "[S]uch 'reckless disregard' can be shown by conduct that subjects a child to a *substantial risk of serious injury*, as well as to a risk of death, because exposure to either type of risk can endanger the child's life." Id. (emphasis added). See also Barrett v. Commonwealth, 268 Va. 170, 185-86 (2004) (affirming conviction under Code § 18.2-371.1(B)(1) where a child, although not actually injured, was "in jeopardy of being injured" when left unattended near an undrained bathtub where she liked to play).

Here, appellant notes that although V.A. sustained red marks and bruising on various areas of his body, he did not require medical attention and was not kept home from school to hide his injuries. Appellant distinguishes cases involving more serious risks to children. See e.g., Duncan, 267 Va. at 385-86 (affirming conviction where the defendant fed alcohol to his baby who had been deprived of food and hydration for several hours). However, a reviewing court must "examine the totality of the evidence" to determine whether appellant's conduct created a "substantial risk of serious injury." Id. at 385. Accordingly, in assessing the risk of injury, we do not limit our review of the record to isolated facts regarding the significance of V.A.'s actual injuries but must also look to the egregiousness of appellant's actions.

Viewed in the light most favorable to the Commonwealth, the evidence demonstrated that appellant repeatedly struck her son with a belt in an angry, intemperate manner. V.A. described repeated beatings, lasting several hours. The court specifically found V.A. credible and noted that appellant corroborated much of his testimony. In finding appellant guilty, the court focused on the repeated nature of the abuse, as well as appellant's admission that although she was aiming for V.A.'s buttocks, she continued to hit him on other areas of his body when he moved away, creating a potential for greater injury. Although V.A. did not need medical attention, the incident caused appellant's sister, Natalia, to call the police. The responding officer photographed the bruises, abrasions, and redness that V.A. sustained to his upper body, which further corroborated V.A.'s

testimony. Because the totality of the evidence demonstrates that appellant's conduct created a substantial risk of serious injury, the court did not err in finding that she showed a reckless disregard for V.A.'s life. See id.

Appellant also asserts that the evidence did not establish that she acted "willfully." "The statutory requirement that . . . conduct be 'willful' means that the conduct must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose." Id. at 384. "Thus, the term 'willful,' as used in Code § 18.2-371.1(B)(1), contemplates an intentional, purposeful act or omission in the care of a child by one responsible for such child's care." Id. at 384-85. See also Ellis v. Commonwealth, 29 Va. App. 548, 554 (1999). "The terms 'bad purpose' [and] 'without justifiable excuse' . . . necessarily imply knowledge that particular conduct will likely result in injury." Id.

Appellant contends that she did not act with a bad purpose, without a justifiable excuse, or without ground for believing her conduct was lawful. Instead, she argues that the evidence shows a "single mother who, after repeated calls from her son's school concerning his behavior and performance, was attempting to instill some measure of discipline for his intractable behavior and to get him to follow her rules."

"It is settled in Virginia that while a parent has the right to discipline his or her child[,] the punishment must be within the bounds of moderation." Diehl v. Commonwealth, 9 Va. App. 191, 195 (1989). "The issue of whether punishment exceeds the bounds of moderation is a question for the trier of the facts." Id. Here, the court found that appellant "exceed[ed] the bounds of moderation" by continuing to strike V.A. on his upper body as he dodged her and that her conduct was not excusable simply because she was frustrated by his behavioral issues at school and his defiance of instructions to complete his homework. Id. Because the evidence supports these

findings, the court did not err in determining that appellant's conduct was willful and therefore violated Code § 18.2-371.1(B)(1).

CONCLUSION

For the reasons above, the evidence was sufficient for the court to find that appellant's conduct showed a "reckless disregard for human life" and was "willful" as required by Code § 18.2-371.1(B)(1). Accordingly, we affirm appellant's conviction.

Affirmed.