UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, O'Brien and Fulton
Argued at Norfolk, Virginia


ROCKY A. MUGYNEI, II

MEMORANDUM OPINION* BY
v.        Record No. 0607-23-1        JUDGE JUNIUS P. FULTON, III
JUNE 11, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Joel P. Crowe, Judge

Michelle C.F. Derrico, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Rocky Mugynei, II, appeals his voluntary manslaughter and felony child abuse convictions

under Code §§ 18.2-35 and -371.1, for which the trial court sentenced him to a total of 20 years of

incarceration with 5 years suspended. He argues that the evidence was insufficient to support either

conviction and that the trial court erred in excluding his cross-examination question of a witness.

We find no error and affirm the judgment of the trial court.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party [below]." *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)). This standard requires us to "discard the evidence of the accused in conflict with that of

the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

## I. R.N.'s Injuries

In the afternoon of February 9, 2021, emergency services responded to a call from an apartment in Portsmouth. R.N., Mugynei's two-year-old child, was not breathing and did not have a pulse. Efforts to resuscitate him en route to the hospital failed.

Dr. Elizabeth Kinnison performed an autopsy the following day. She found significant internal bleeding in R.N.'s abdomen with bruising on the abdominal wall and several internal lacerations in his abdomen and intestinal areas. She concluded that R.N. died from blunt force trauma to his abdomen. Externally, she also found blunt force trauma injuries to his head, torso, scrotum, and limbs.

Dr. Michelle Clayton, an expert in child abuse pediatrics, attended the autopsy. She testified that R.N.'s abdominal trauma could only be caused by "an extremely high level of force that wouldn't be in any way involved in normal parenting or play." She compared the requisite force to a car collision or falling from several stories of elevation. A child injured in this way would not behave normally; milder symptoms include general nausea or decreased appetite, and more severe symptoms would be vomiting, pain, and loss of consciousness. The onset of symptoms could be slow or sudden. Dr. Clayton concluded that R.N. "would have become quite ill fairly quickly after his injury" and that a "prudent caregiver would have noticed." She noted that R.N. externally had a total of more than 70 bruises and 100 abrasions. The autopsy report and photographs documenting R.N.'s internal and external injuries were introduced into evidence at Mugynei's jury trial.

## II. Mugynei's First Interview

Mugynei spoke with police after R.N. was transported from the apartment. He stated he had not gone to sleep until 8:00 a.m. that morning and he woke up around 1:15 p.m. Talaysia Nelson, R.N.'s mother, cared for R.N. that morning. Mugynei stated that in the morning, R.N. had not wanted to eat or drink. Nonetheless, Mugynei claimed, R.N. behaved normally, and they played basketball together. At some point, Mugynei put R.N. on the couch to watch television. Mugynei stepped out of the room for a phone call for several minutes; when he returned R.N. was unconscious on the couch in the same position. Mugynei called his mother and then 911 at 3:17 p.m.

Mugynei stated R.N. had not vomited that day but had done so around 10:00 p.m. or 11:00 p.m. the night before. R.N. held his stomach before he vomited, and Mugynei claimed his vomit was "watery." Mugynei stated that he and Nelson did not take R.N. to doctor visits routinely; he did not know if R.N. had a primary doctor. During this interrogation, Mugynei was under the mistaken belief that R.N. suffered from a concussion. He told police that R.N. played "rough" and that was the likely cause of the concussion. Mugynei denied any physical play with R.N. the night before. During the first interrogation, neither law enforcement nor R.N.'s family had yet been notified that R.N. had died.

## III. Mugynei's Second Interview

Law enforcement interrogated Mugynei a second time the following day after R.N.'s autopsy took place. Mugynei admitted during this interview that Nelson's former roommate had accused him of abusing R.N. several months before when Mugynei "whip[ped]" R.N. with a belt. Mugynei explained that he used a belt because he would hit R.N. too hard with just his hand. He also admitted that a week before, he accidentally struck R.N.'s scrotum with a belt as R.N.

- 3 -

"squirmed" during a whipping.[1]  When confronted with R.N.'s many external bruises and lacerations, Mugynei blamed it on R.N. being an active child, but admitted that his nails would scratch R.N. when grabbing him.  He denied ever seeing anyone else cause any injury to R.N.

Although he denied any physical play in his interview, Mugynei admitted it was possible he may have "kneed" R.N. while wrestling the night before R.N. died.  When pressed further, his story evolved; he admitted to striking R.N. with an "elbow drop."  He described the elbow drop as bringing his elbow down while "flopping" onto R.N.  Later in the interview, Mugynei again described the incident as "kneeing" R.N.  Nelson saw the wrestling and told Mugynei to play more gently with the child.  R.N. first vomited 30 minutes after the "wrestling" ended.  Mugynei then admitted that R.N. vomited two more times that night before bed.  Neither he nor Nelson sought medical treatment for R.N.  Mugynei admitted he was worried that a medical provider, after seeing R.N.'s external injuries, would accuse him of abuse.

## IV.  Trial

Mugynei was indicted for second-degree murder under Code § 18.2-32 and felony child abuse under Code § 18.2-371.1.  During his jury trial, along with the evidence above, the Commonwealth also introduced a child's shirt and several pillows with red staining that law enforcement collected from the apartment when they first arrived.

Cyntoria Nelson ("Cyntoria"), Nelson's mother and R.N.'s maternal grandmother, witnessed Mugynei forcefully grabbing R.N. on several occasions.  Although she "didn't like it" and "didn't say anything at the time," she nonetheless "noted it" and "paid attention."  At a later visit which lasted "hours," R.N. was dressed "head to toe" with multiple layers of jackets, coats, and clothing.  Cyntoria testified that "they didn't even take his coat off" so she could not see if R.N. had

---

[1] Mugynei later claimed in the same interview that this whipping occurred several weeks before.

any bruises. She recalled specifically that the last time she saw R.N. alive was three weeks before his death. At that time, his left eye was bruised "because it was purple and green." On cross-examination, Cyntoria admitted that Nelson "smirked" when questioned about R.N.'s bruised eye and was not "the best parent."

On cross-examination, Mugynei attempted to question Cyntoria about an incident that had occurred during the summer of 2020 when R.N. burned his hand on a curling iron while in Nelson's care. The circuit court sustained the Commonwealth's objection to this question on the grounds that it was outside the scope of direct examination.

Detective Bloodworth testified that after arresting Mugynei, he asked whether either Mugynei's mother or friend—who had both been in the apartment in the two days before the 911 call—could have injured R.N. According to Bloodworth, Mugynei stated that his mother could not have caused the injury and that his friend was never alone with R.N. and also could not have caused the injury. Mugynei also denied that Nelson could have caused R.N.'s injury.

The Commonwealth rested, and Mugynei declined to put on any evidence. The trial court denied Mugynei's motion to strike and submitted the case for jury deliberation. The jury found Mugynei guilty of the lesser-included offense of voluntary manslaughter under Code § 18.2-35 and the child abuse as charged. The trial court sentenced Mugynei to a total of 20 years of incarceration with 5 years suspended. This appeal followed.

ANALYSIS

I. Cross-Examination of Cyntoria

Mugynei first argues that the trial court erred in not permitting him to ask about the curling iron incident during his cross-examination of Cyntoria. "It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73

Va. App. 221, 231 (2021) (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)).  This means the court "has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law."  *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 93 (2021) (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).  "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action."  *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)).  "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.  The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."  Va. R. Evid. 2:611(b)(i).

During Cyntoria's direct examination, the Commonwealth asked her about instances in which R.N. suffered injuries while in Mugynei's care, not about every instance in which R.N. suffered an injury.  Thus, the trial court correctly noted that Mugynei's attempt to introduce collateral evidence of an injury the child suffered while in Nelson's care exceeded the scope of direct examination.  Under Rule 2:611(b)(i), it was clearly within the trial court's discretion to limit cross-examination to the scope of direct examination, and we find no abuse of that discretion here.

Mugynei alleges that admission of the excluded testimony was necessary for a fair trial, both because this evidence supported his claim that someone other than Mugynei may have caused R.N.'s injury and because the evidence impeached Cyntoria by demonstrating bias in favor of Nelson.

On direct examination, Cyntoria clearly admitted that Nelson was not a good parent and that she acted cavalierly when R.N. was injured. Thus, introducing evidence of the curling iron incident on cross-examination was not probative of Cyntoria's honesty or bias as it was fully consistent with testimony about Nelson's neglectful parenting of R.N. Further, the incident occurred several months before R.N.'s death and the injuries he sustained from the curling iron incident were inconsistent with those related to his death. For these reasons, Mugynei fails to establish that he suffered meaningful prejudice from the ruling or that the trial court abused its discretion. Finally, we note that the trial court's ruling did not prevent Mugynei from attempting to introduce this evidence altogether. The ruling only prevented Mugynei from introducing this evidence on cross-examination. Mugynei had the opportunity to call Cyntoria as part of his own case to testify to instances when R.N. was injured only in Nelson's care; he chose not to do so.

## II. Sufficiency of Evidence

Mugynei next asserts that the trial court erred in denying his motions to strike and finding sufficient evidence to convict him of the offenses.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). In such cases, "[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction,

'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

### A. Voluntary Manslaughter

Mugynei argues that the evidence did not establish that he caused R.N.'s injuries. We disagree.

"[A]ny fact that can be proved by direct evidence may be proved by circumstantial evidence." *Haskins v. Commonwealth*, 44 Va. App. 1, 6 (2004) (quoting *Etherton v. Doe*, 268 Va. 209, 212-13 (2004)). "[W]hile no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Williams v. Commonwealth*, 71 Va. App. 462, 484-85 (2020) (alterations in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)).

The medical evidence conclusively established that R.N. died from blunt force trauma to his abdomen. Such an injury would have resulted in a child falling ill, including nausea, vomiting, and lack of appetite. The autopsy revealed that R.N.'s injuries resulted in significant amounts of blood pooling in his abdomen. Mugynei eventually admitted that while wrestling on the night before R.N.'s death, he "elbow dropped" R.N. Mugynei also admitted that 30 minutes after this "wrestling," R.N. vomited a total of three times within a short period. Mugynei claimed this vomit was "watery," but photos and physical evidence showed red stains on pillows and child's clothing consistent with vomited blood.[2] This evidence establishes a timeline that R.N. suffered his abdominal injury while "wrestling" with Mugynei and fell ill afterwards.

---

[2] This assertion the R.N.'s vomit was merely "watery" was also made while Mugynei was actively lying about the number of times R.N. vomited, which reduces its credibility.

Mugynei also lied in his initial interview; he claimed he did not act physically with R.N. at all and that R.N. only vomited once. Only after being confronted with the evidence did Mugynei admit to "wrestling" with R.N. and that R.N. vomited three times. "[I]n drawing inferences from the evidence, the fact finder may conclude regarding even a non-testifying defendant that his false statements establish that he has lied to conceal his guilt." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019). Thus, the jury could reasonably infer that Mugynei's lies about "wrestling" with R.N. and R.N.'s symptoms afterward were evidence of guilt. This inference was strengthened by Mugynei's admissions that he had been accused by others of abusing R.N. and that he feared medical providers would conclude likewise if given the opportunity to examine R.N.

Mugynei relies upon precedent holding that a conviction must be overturned when there is no evidence as to how an injury occurred, much less that the defendant caused it.[3] But such evidence establishing a "chain of unbroken circumstances" connecting R.N.'s fatal injuries to Mugynei's actions did exist in the present case. Mugynei's admissions to striking R.N. while "wrestling," along with R.N.'s symptoms following shortly thereafter and consistent with the medical testimony, were evidence indicating that Mugynei caused the injury. The jury also could have inferred from Mugynei's ever evolving account of his interactions with R.N. that he was lying and that he knew he caused R.N.'s injury and attempted to conceal his guilt. Thus, the totality of the evidence supports the jury's finding that Mugynei caused R.N.'s fatal injury, and we do not disturb it on appeal.

---

[3] *See Commonwealth v. Smith*, 259 Va. 780, 783-84 (2000) (holding that wounds sustained while the victim was unconscious could not be attributed to the defendant without additional evidence); *Christian v. Commonwealth*, 221 Va. 1078, 1082 (1981) (holding that others had the opportunity to inflict the injury and there was no direct evidence that defendant caused it).

*B. Child Abuse*

A parent "who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony." Code § 18.2-371.1(A). "To be willful, conduct 'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose.'" *Jones v. Commonwealth*, 272 Va. 692, 699 (2006) (quoting *Commonwealth v. Duncan*, 267 Va. 377, 384 (2004)). "The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality." *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999).

Mugynei argues that the evidence failed to establish that he abused R.N. by willful act or failure to provide care, the two theories presented by the Commonwealth at trial. As outlined above, the evidence sufficiently established that Mugynei caused R.N.'s injury. The jury could also conclude that the act was intentional rather than accidental. The expert testimony established that R.N.'s injury could only occur with significant force well beyond that of normal parenting or play and compared it to a car crash or falling from several stories. This evidence impeaches Mugynei's claim that the "wrestling" only involved normal play and that any injury was accidental. R.N.'s excessive number of external bruises and abrasions was consistent with intentional on-going child abuse. Mugynei admitted to abusive discipline, such as causing R.N.'s abrasions with his nails and injuring R.N.'s scrotum while striking him with a belt. He also admitted that he used a belt to discipline R.N. because he could not control his own force otherwise. A reasonable fact-finder could therefore conclude beyond a reasonable doubt that Mugynei acted intentionally in causing R.N.'s blunt force trauma.

The evidence also is sufficient to support a finding that Mugynei failed to provide necessary care for the child. R.N. did not just vomit once shortly after being injured by Mugynei; he vomited three times. The vomit was not merely "watery," as evidenced by the red stains on clothing and pillows.[4] R.N. clearly needed medical attention, and Dr. Clayton opined that a "prudent caregiver would have noticed." Mugynei admitted he did not take R.N. for medical care generally, at least in part because of his concerns about accusations of child abuse. The jury could therefore conclude that Mugynei failed to provide R.N. that obviously needed care in an effort to protect himself and conceal his abuse. Waiting until R.N. was unconscious and unresponsive to call 911 fell short of his parental obligations to care for R.N.'s injuries.

For these reasons, the evidence was sufficient to support the jury's conclusion that Mugynei was guilty of child abuse.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

---

[4] The inference that R.N.'s vomit was bloody is corroborated by the red stains on the pillow and shirt presented at trial.