COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued at Richmond, Virginia


KASSCEEN LAZANE WEAVER

v.      Record No. 0285-24-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JEAN HARRISON CLEMENTS
JULY 29, 2025


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Edward A. Robbins, Jr., Judge

Paul C. Galanides (Stephen A. Mutnick; Winslow, McCurry &
MacCormac, PLLC, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Kassceen Lazane Weaver appeals his convictions for felony murder, child neglect, and

concealing a dead body.  He first argues that the trial court erred by not suppressing evidence

obtained during the execution of two search warrants he claims were invalid.  He also argues that

the trial court abused its discretion by admitting an expert report at trial and by denying two

proposed jury instructions.  Finally, he challenges the sufficiency of the evidence supporting

each of his convictions.  We affirm.[1]

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Weaver has withdrawn his assignment of error concerning the late filing of the
Commonwealth's expert notice.

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'"  *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Weaver began dating Dina Weaver ("Dina") in 1993, and the two were married in September 2015.  The couple's first child, L.W., was born at a hospital in 2011.  Their second child, A.W., was born at home in September 2015.  Dina worked 12-hour shifts as a pharmacist, while Weaver stayed home and was the primary caregiver for both children.  Nobody but Weaver watched the children, nobody visited the home, and Weaver did not permit the children to leave the home.

Unlike L.W., who "was an easy baby," A.W. was "slow" to meet childhood milestones, like walking and talking.  According to Dina, Weaver refused to let A.W. see a pediatrician because he "really didn't believe in doctors."  Thus, A.W. never visited a doctor during his lifetime.

Weaver regularly complained to Dina that A.W. cried every day and could not be consoled or satisfied.  According to Dina, Weaver "didn't have as much patience with [A.W.] as he had with [L.W.]"  Weaver was "very rough" and "[j]ust very, very aggressive with" A.W.  When A.W. cried, Weaver would hit him with a belt or his hand.  Weaver was 6 feet, 3 inches tall and weighed around 200 pounds, while A.W. weighed "[m]aybe 30 pounds."  A.W. "always had bruises on him in some way or another" "[b]ecause he was always being punished."  Dina testified that Weaver once kicked A.W., who "fell forward and his front tooth got pushed up into

- 2 -

his jaw."[2] She also described A.W. as "clumsy" and described how he once fell off the bed of his own accord, after which he seemed "fine."

In mid-October 2018, A.W. cried until he passed out. When Dina revived him with CPR, he looked at her "dazed" and "confused" and put his hand on his head. He "act[ed] normal after that." On a separate occasion "around that period," A.W. "projectile vomited out of the blue, which never happened."

Around 6:30 p.m. on October 23, 2018, nine days after A.W. had passed out, Weaver called Dina while she was at work and told her that A.W. was not breathing, "[j]ust like last week." Weaver asked Dina to "[c]ome home now" but she could not do so immediately because Weaver had driven her to work. Dina told Weaver to call 911 or take A.W. to the hospital, which was about a quarter of a mile away from the couple's house. When she told him that, Weaver stated that A.W. was "coming to." Dina advised him to try CPR. Eventually, Dina received a ride home from her coworker's mother. She talked to Weaver during the drive, who assured her that A.W. was awake, "okay," and "all right."

Dina arrived home between 40 minutes and an hour after Weaver called. When she got home, she ran upstairs to find A.W. lying on the floor covered in vomit. He was neither breathing nor alert. Dina tried to perform CPR but it had no effect. She "begged" Weaver to let her take A.W. to the hospital but he refused, claiming that if they did so they would lose custody of L.W. because of A.W.'s bruises. As Dina continued her attempts to revive A.W., Weaver stated, "[h]e's gone."

Neither Dina nor Weaver notified the police or anybody else about A.W.'s death. Instead, Dina washed A.W.'s body and placed him in his crib. She did not see any new bruises

---

[2] Dina admitted during cross-examination that she had previously told the police that A.W. fell but omitted that Weaver had kicked him.

or cuts on his body when she washed him. Weaver then wrapped A.W.'s body in linens and placed him in a plastic storage bin. They kept the storage bin in A.W.'s room for some time. Once it started to smell, Weaver bought a deep freezer. He put the storage bin in the freezer and put the freezer in the garage. Dina claimed that she and Weaver discussed "[i]n passing" buying land and burying the body, but she denied that there were any religious motives to keep the body in the freezer. She testified that they did not tell anybody that A.W.'s body was in the freezer because they "[d]idn't want to" and "it was a crime."

On May 3, 2021, more than two and a half years after A.W.'s death, Dina called her brother Dominic Minnitte while she was at work and told him that A.W.'s body was in the freezer. Minnitte was living in Connecticut at the time and did not have much contact with Dina because he ordinarily could not reach her by phone.

Minnitte reported Dina's statements to Chesterfield County Police Detectives Nicholas Frazier and Joanna Hartsook. Hartsook then applied for a search warrant of the Weavers' home ("search warrant A"). The affidavit for search warrant A, which was not shown to the jury at trial, relayed Minnitte's statements to the police that Dina had called him the day before, told him the circumstances of A.W.'s death, and told him that A.W.'s body was still in a freezer inside the Weavers' home. Minnitte also told the police that Dina had told him that Weaver was physically abusive and that she was afraid Weaver would kill her. Hartsook wrote in the affidavit that she "found [Minnitte] to be credible and consistent in his recounting about Dina's statements." The magistrate issued the search warrant, authorizing the police to search for and seize surveillance cameras, blankets and bedding, the freezer and its contents, any documents bearing A.W.'s name, printed family photos, firearms, and computers and electronic storage devices "to include all data contained therein."

The police executed the warrant and located the freezer in the garage. The garage door was locked so that it could not be accessed from inside the house. Inside the freezer was a plastic container underneath "a lot of frozen turkeys and bags of ice." The police removed the plastic container from the freezer and opened it. Inside was a bed sheet, wood blocks, and a vacuum-sealed plastic bag. After several minutes, the police began to smell a "decomp[osition] fecal-type smell." The police gave the storage bin and its contents to the medical examiner.

The police obtained a second search warrant several hours after the first ("search warrant B"). According to the affidavit, the police had found documents and a letter that showed "an abuse related home environment." The search warrant authorized the police to seize the freezer and "documents."

Weaver moved to suppress evidence obtained from the search warrants, asserting that they were constitutionally deficient. Specifically, he argued that search warrant A was unsupported by probable cause because it did not establish Minnitte's credibility, lacked particularity in describing the evidence to be seized, and lacked a nexus between the items sought and the offense of concealing a dead body. Weaver also argued that search warrant B was constitutionally deficient because it was not supported by probable cause and was overbroad. Finally, he argued that both warrants were so deficient in probable cause that the good faith exception could not apply. The trial court denied the suppression motion after a hearing. The court's written order does not explain the basis for the court's denial.[3]

Assistant Chief Medical Examiner Dr. Jeffery Gofton performed the autopsy. Gofton received A.W.'s remains on May 4, 2021, still frozen and wrapped in multiple garments bound with string inside the plastic tub. The "body was in an advanced state of decomposition," which complicated the autopsy. For example, A.W.'s brain was "markedly decomposed" such that

---

[3] As explained later, the transcript of the hearing is not part of the record on appeal.

Gofton could not "assess the brain tissue" for injuries. Similarly, A.W.'s lungs were "[v]ery decomposed" and difficult to examine.

Gofton requested assistance from forensic anthropologist Dr. Tal Simmons, who examined A.W.'s remains in May 2021. Simmons documented two antemortem skull fractures; one fracture was 1.5 centimeters long and the other was 2.5 centimeters long.[4] She concluded that the fractures occurred at different times, but "neither [wa]s recent." In her opinion, they had occurred "far in excess of" ten weeks before A.W.'s death and could have been older than ten months. She opined that those fractures were caused by blunt force trauma and that it was highly unusual for those types of injuries to be accidental.

A.W. also had an antemortem right arm fracture that had been caused by "pulling and twisting of the limb." And he had one antemortem rib fracture that was healing. Aside from his antemortem injuries, A.W. had four rib fractures on the same side that had occurred "right around the time of death." Those fractures were consistent with non-accidental causation.

Simmons produced a written report. Weaver objected to the report's admission, arguing that it was needlessly cumulative of Simmons's testimony and was hearsay. The Commonwealth responded that it was not cumulative and was an admissible business record. Outside the presence of the jury, Simmons testified that she always produced a report after examining remains, that she kept those reports as part of her regularly conducted business, and that she produced the A.W. report "within two months" of her examination. The trial court overruled Weaver's objection and admitted the report.

Simmons sent her report to Gofton, who incorporated her findings into his final autopsy report. Gofton concluded that A.W. died from "[m]ultiple blunt force injuries." In Gofton's

---

[4] Antemortem injuries are those that occurred sufficiently long before death to begin healing.

view, the skull fractures contributed to A.W.'s death, "[m]ost likely through injury of the underlying brain lining." He explained that "blunt force can cause concussion within the brain, can cause injury to the brain itself" and "can cause bleeding." Although Gofton did not observe any evidence of subdural or epidural hematomas in the brain, he testified that was "[n]ot surprising" given the state of decomposition. Gofton also believed that the rib fractures could have impaired A.W.'s breathing. He admitted that he did not know that CPR had been performed and that CPR could lead to rib fractures, but he opined that A.W.'s rib fractures were not in a location typically associated with CPR. Gofton also admitted that any underlying injuries caused by the fractures could have healed by the time of A.W.'s death and that he could not rule out a variety of other causes of death.

Forensic pathologist Dr. Jonathan Arden reviewed Gofton's autopsy report and testified as part of Weaver's case in chief. In Arden's view, none of the observed fractures could have caused A.W.'s death. According to Arden, evidence of underlying bleeding in the brain or damage to the lungs would still have been visible despite the level of decomposition. That no such evidence was visible suggested a lack of underlying injury, and the fractures alone could not have killed A.W. Arden also opined that A.W.'s rib fractures were consistent with CPR. Ultimately, Arden concluded that it was impossible to determine the cause of death. When asked on cross-examination what a person should normally do when another has stopped breathing, Arden responded that, "[m]ost commonly, if somebody were not breathing, I think a 911 call would be the approach."

The indictments, as amended upon Weaver's motion for a bill of particulars, charged that Weaver murdered A.W. "while in the prosecution of . . . child abuse/neglect," in violation of Code § 18.2-33; "permit[ed] serious injury to [A.W.'s] life or health" "by willful act or omission or refusal to provide any necessary care," in violation of Code § 18.2-371.1(A); and "unlawfully

- 7 -

and feloniously secrete[d] or conceal[ed] a dead body," in violation of Code § 18.2-323.02. The

trial court gave the following instruction regarding child abuse or neglect:

> The defendant is charged with the crime of child abuse or neglect resulting in serious injury. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> > (1) That the defendant was a parent, guardian, or other person responsible for the care of [A.W.]; and
> >
> > (2) That [A.W.] was under the age of 18; and
> >
> > (3) That the defendant, by willful act, or willful omission, or willful refusal to provide the necessary care for the health of [A.W.], permitted serious injury to the life or health of [A.W.].
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty.
>
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the crime, then you shall find the defendant not guilty.[5]

The trial court also gave the following instruction defining "willful":

> A willful act is one done with bad purpose, or without justifiable excuse, or without ground for believing it is lawful. A willful act is intentional, or knowing, or voluntary, as distinguished from accidental. The terms "bad purpose" of [sic] "without justifiable excuse" require knowledge that the particular conduct will likely result in injury or illegality.[6]

Weaver proposed two additional instructions that the trial court denied. The first

instruction (the "necessary care instruction") stated that "Necessary care is that which is required

to prevent additional serious injury to the life or health of a child. The Commonwealth must

---

[5] This instruction largely tracked Virginia Criminal Model Jury Instruction No. 29.340, except that the trial court added the word "willful" before "refusal to provide care" at Weaver's request and without objection by the Commonwealth.

[6] This instruction follows Virginia Criminal Model Jury Instruction No. 29.360.

prove that additional serious injury to the life or health of a child occurred because of the accused's failure to provide necessary care." Weaver derived that instruction from this Court's unpublished decision of *Thompson v. Commonwealth*, No. 0842-16-2 (Va. Ct. App. Aug. 15, 2017). The court rejected the instruction on the ground that *Thompson* was unpublished and has never been cited as persuasive authority.

Weaver also submitted an instruction and associated verdict form that would have required a unanimous determination from the jury as to whether he committed child abuse or neglect by a "willful act" or a "willful omission" or a "willful refusal to provide necessary care for the child's health" ("unanimity instruction"). In other words, if part of the jury determined that Weaver had committed a willful act while part of the jury determined that Weaver had committed a willful omission, the instruction provided that the jury should find Weaver not guilty. The trial court refused that instruction.

The trial court instructed the jury that, to convict Weaver of felony murder, it must conclude that the killing was "caused by acts performed in the commission of child abuse or neglect" and that "the killing and felony child abuse or neglect were parts of one continuous transaction and were closely related in time and place." The court provided a separate instruction defining "proximate cause," without objection. In response to a jury question whether "proximate cause" was "the same" as "cause" in the felony murder instruction, the court answered in the affirmative, with both parties' agreement.

Following the evidence and arguments, the jury convicted Weaver of felony murder, child abuse or neglect, and concealing a dead body. The trial court sentenced Weaver to 20 years' incarceration for felony murder, 10 years for child abuse or neglect, and 5 years for concealing a dead body, with the sentences to run concurrently, for a total active sentence of 20 years' incarceration.

ANALYSIS

I. Weaver has not provided an adequate record to evaluate his suppression arguments.

"The transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court no later than 60 days after entry of the final judgment." Rule 5A:8(a). "This deadline may be extended by a judge of this Court only upon a written motion filed within 90 days after the entry of final judgment." Rule 5A:8(a). "When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered." Rule 5A:8(b)(4)(ii). "If . . . the transcript [or statement of facts] is indispensable to the determination of the case, then the requirements for making the transcript [or statement of facts] a part of the record on appeal must be strictly adhered to." *Bay v. Commonwealth*, 60 Va. App. 520, 528 (2012) (alterations in original) (quoting *Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986)). "This Court has no authority to make exceptions to the filing requirements set out in the Rules." *Shiembob v. Shiembob*, 55 Va. App. 234, 246 (2009) (quoting *Turner*, 2 Va. App. at 99); *see also Bay*, 60 Va. App. at 528. "Whether the record is sufficiently complete to permit our review on appeal is a question of law." *Bay*, 60 Va. App. at 529.

The trial court issued the final order on January 19, 2024. Sixty days after the final judgment was March 19, 2024. Upon Weaver's motion we granted an extension of time to file the transcripts until April 18, 2024. On April 29, 2024, Weaver moved again to extend the time to file the transcripts. We denied that motion because it was filed more than 90 days after the final order. Weaver then filed the transcript of the suppression hearing on May 6, 2024. That transcript is late, and we cannot consider it.

The missing transcript is indispensable to resolving Weaver's challenge to the trial court's suppression ruling. Weaver "bears the burden of establishing that the denial of his suppression

motion was reversible error." *Baskerville v. Commonwealth*, 76 Va. App. 673, 684 (2023) (quoting *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008)). A "claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact." *Id.* (quoting *King v. Commonwealth*, 49 Va. App. 717, 721 (2007)). We review de novo whether the Fourth Amendment was violated but "review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* (alteration in original) (quoting *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021)).

The exclusionary rule does not "bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Adams v. Commonwealth*, 275 Va. 260, 268 (2008) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). "[T]he good-faith inquiry" is not "limited to the sworn, written facts set forth in the four corners of the search warrant affidavit." *Id.* Rather, a court must consider "'the totality of the circumstances including what [the executing police officers] knew but did not include in [the] affidavit' when conducting the good-faith analysis." *Id.* at 270 (alterations in original) (quoting *United States v. Martin*, 833 F.2d 752, 756 (8th Cir. 1987)).

The record before this Court does not contain the grounds for the trial court's ruling, as the trial court's written order indicated only that Weaver's motion was denied. Even if the warrants were deficient, the trial court could have determined that the officers' reliance on them was reasonable and in good faith. Without the missing transcript, we are unable to assess "the totality of the circumstances" necessary to consider good faith. We are also in the dark as to any factual findings the trial court might have made, findings that are entitled to deference on appeal. Thus, Weaver has failed to ensure that the record contains the material necessary to permit this Court to resolve his assignment of error, and we affirm the trial court's denial of his suppression motion.

II. The trial court did not abuse its discretion by admitting Simmons's written report.

"It is well-settled that decisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion." *Shahan v. Commonwealth*, 76 Va. App. 246, 255 (2022) (quoting *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Nottingham*, 73 Va. App. at 231 (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

Weaver first argues that Simmons's report was needlessly cumulative of Simmons's testimony. "Relevant evidence may be excluded if . . . the evidence is needlessly cumulative." Va. R. Evid. 2:403(b). "Cumulative [evidence] is repetitive [evidence] that restates what has been said already and adds nothing to it. It is [evidence] of the same kind and character as that already given." *Commonwealth v. Proffitt*, 292 Va. 626, 640-41 (2016) (quoting *Massey v. Commonwealth*, 230 Va. 436, 442 (1985)). "A party may offer multiple forms or sources of evidence to establish a matter, and the fact that offered evidence is 'cumulative to some extent' will not preclude its consideration by the trier of fact." *Id.* (quoting *Massey*, 230 Va. at 442).

Simmons's report was not needlessly cumulative. Although much of her testimony was also contained in her report, the report contained additional information that might be helpful to the jury, including a more detailed description of A.W.'s various injuries and photographs of those injuries that necessarily went beyond what Simmons could convey by words alone. Hence, the trial court correctly overruled Weaver's cumulativeness objection.

Weaver also argues that Simmons's report was hearsay and did not qualify for the business records exception to the hearsay rule. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of

- 12 -

justice." Rule 5A:18. The objection "must be both *specific* and *timely*." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). "Making one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). A contemporaneous objection allows opposing counsel and the trial court a fair opportunity to address the challenge and prevent unnecessary appeals and retrials. *Bethea*, 297 Va. at 743-44; *Scialdone v. Commonwealth*, 279 Va. 422, 437 (2010); *Jones v. Commonwealth*, 71 Va. App. 597, 607 (2020).

Hearsay is not admissible unless an exception applies. Va. R. Evid. 2:802. One hearsay exception is for records of a regularly conducted activity. Va. R. Evid. 2:803(6). The exception's first requirement is that the record must have been "made at or near the time of the acts, events, calculations, or conditions by—or from information transmitted by—someone with knowledge." Va. R. Evid. 2:803(6)(A). The second requirement is that the record must have been "made and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling."[7] Va. R. Evid. 2:803(6)(B).

On appeal, Weaver contends that Simmons's report fails to satisfy the first requirement— that it be made at or near the time of the relevant events—because Simmons did not finalize her report until two months after examining A.W.'s bones. Weaver did not make that argument below, however. Rather, he argued to the trial court that the report was not made in the course of Simmons's regularly conducted business activity and therefore failed the exception's *second* requirement. Thus, Weaver failed to preserve his argument that Simmons's report was too remote in time from her examination to qualify as a business record. He does not invoke any of the exceptions to Rule 5A:18, and we do not raise them sua sponte. *Spanos v. Taylor*, 76 Va. App. 810,

---

[7] The other requirements for the business records exception are not at issue here.

- 13 -

828 (2023).  Accordingly, we do not consider whether the trial court erred by finding that Simmons's report satisfied the business records exception.

III.  The trial court did not abuse its discretion by denying Weaver's proposed jury instructions.

"A trial court 'has broad discretion over whether to give or deny proposed jury instructions.'"  *Taylor v. Commonwealth*, 77 Va. App. 149, 166 (2023) (quoting *Huguely v. Commonwealth*, 63 Va. App. 92, 129 (2014)).  Our "responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'"  *Conley v. Commonwealth*, 74 Va. App. 658, 674-75 (2022) (quoting *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019)).  We review de novo "[w]hether a jury instruction accurately reflects the relevant law."  *Drexel v. Commonwealth*, 80 Va. App. 720, 742 (2024) (alteration in original) (quoting *Lindsey v. Commonwealth*, 293 Va. 1, 5 (2017)).  But we review a trial court's final decision to deny a requested jury instruction for abuse of discretion.  *Id.*

Both of Weaver's denied jury instructions pertain to Code § 18.2-371.1(A), which prohibits "[a]ny parent, guardian, or other person responsible for the care of a child under the age of 18" to "cause[] or permit[] serious injury to the [child's] life or health" "by willful act or willful omission or refusal to provide any necessary care for the child's health."

A.  The trial court did not abuse its discretion by denying Weaver's necessary care instruction.

Weaver argues that his jury instruction defining necessary care was supported by our unpublished decision in *Thompson* and that the trial court therefore abused its discretion in denying it.  As an initial matter, we note that "[a] statement made in the course of a judicial decision is not necessarily proper language for a jury instruction."  *Smith v. Commonwealth*, 33 Va. App. 65, 73 (2000) (quoting *Yeager v. Commonwealth*, 16 Va. App. 761, 766 (1993)).  Moreover, it is not reversible error to refuse even an instruction that correctly states the law if the given instructions adequately cover all relevant issues.  *Taylor*, 77 Va. App. at 166.  Finally, a trial court should not

give an instruction that "would be confusing or misleading to the jury." *Schmuhl v. Commonwealth*, 69 Va. App. 281, 311 (2018), *aff'd*, 298 Va. 131 (2019) (quoting *Morgan v. Commonwealth*, 50 Va. App. 120, 133 (2007)).

The jury instructions the trial court provided adequately covered all relevant issues. The court instructed the jury that Weaver was guilty only if his willful act, willful omission, or willful refusal to provide necessary care "permitted serious injury" to A.W. That language, taken almost verbatim from the statute, was sufficient to apprise the jury of the required connection between Weaver's conduct and A.W.'s injury.

In *Thompson*, the defendant accidentally spilled hot bacon grease on her child's bare feet. *Thompson*, slip op. at 2. The defendant did not provide any treatment for the burns, but the child's father took the child to the hospital ten days later. *Id.* The nurse practitioner testified that the untreated burns "could have led to 'a massive infection from [the child's] feet.'" *Id.* But no infection materialized, and "the burns 'were in the process of healing.'" *Id.* at 2-3. We reversed the defendant's conviction for child neglect under Code § 18.2-371.1(A). *Id.* at 7. After explaining that the burns were accidental and could not support the conviction, we explained that there was "no evidence that [the child] actually suffered the required 'serious injury,' over and above the initial accidental burns, as a result of appellant's failure to take the child to be examined by a medical professional." *Id.* at 5 (emphasis omitted).

From that, Weaver derived his proposed instruction that the Commonwealth must prove that his refusal to provide necessary care caused A.W. "additional serious injury." But that phrase, removed from *Thompson*'s factual context, could confuse the jury.[8] A jury receiving such an instruction may question whether the natural continuation of A.W.'s condition if left untreated

---

[8] In fact, our opinion in *Thompson* never used the phrase "additional" when describing the necessary injury.

- 15 -

would constitute an "additional" injury. Because the other instructions were adequate and the proposed instruction could have confused the jury, the trial court did not abuse its discretion by denying Weaver's necessary care instruction.

### B. Weaver's unanimity instruction did not correctly state the law.

Next, Weaver argues that the trial court abused its discretion by denying his unanimity jury instruction and associated verdict form. He contends that Code § 18.2-371.1(A) requires unanimity as to whether he violated the statute by committing a willful act, or a willful omission, or a willful refusal to provide necessary care. We disagree.

We rejected a similar argument in *Davison v. Commonwealth*, 69 Va. App. 321 (2018), *aff'd*, 298 Va. 177 (2019). *Davison* involved a forcible sodomy conviction under Code § 18.2-67.1, which prohibits certain acts done "by force, threat or intimidation . . . or through the use of the complaining witness's mental incapacity or physical helplessness." We explained that "the alternative means of force, physical helplessness, and mental incapacity are independent elements of a single offense or the means by which the offense was accomplished." *Davison*, 69 Va. App. at 328. Thus, the jury was not required to be unanimous as to which of the alternative means of accomplishing the offense applied. *Id.* at 328-29. The Supreme Court "agree[d] with th[at] analysis." *Davison*, 298 Va. at 179.

Code § 18.2-371.1(A) is structured similarly to Code § 18.2-67.1. "[W]illful act or willful omission or refusal to provide any necessary care" are alternative means of accomplishing the offense, not separate elements of the offense. Code § 18.2-371.1(A). Accordingly, unanimity on the means is not required, and the trial court properly refused Weaver's unanimity instruction and associated verdict form as incorrectly stating the law.

- 16 -

IV.  Sufficient evidence supports Weaver's convictions.

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one."  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).  "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'"  *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

A.  Sufficient evidence supports Weaver's conviction for child neglect.

Felony child neglect occurs when "[a]ny parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child."  Code § 18.2-371.1(A).  Weaver contends that the Commonwealth failed to prove: (1) that Weaver acted "willfully," or (2) that his actions caused A.W.'s death.  We disagree.

"'[W]illful' means that the conduct must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a

- 17 -

bad purpose." *Commonwealth v. Duncan*, 267 Va. 377, 384 (2004); *see also Ellis v. Commonwealth*, 29 Va. App. 548, 554-55 (1999) (holding that the usual definition of "willful" applies to Code § 18.2-371.1). Put another way, "[a]n act is willful if it is intentional, purposeful, or involves a reckless disregard that injury will probably result from it." *Justice v. Commonwealth*, 82 Va. App. 237, 246 (2024). "Willfulness is synonymous with criminal negligence or recklessness and is judged under an objective standard that asks whether the actor 'knew or should have known the probable results' of h[is] acts." *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 544 (2015)). "Determining willfulness is fact specific" and "'depends entirely on the circumstances of each case.'" *Id.* (quoting *Barnes v. Commonwealth*, 47 Va. App. 105, 113 (2005)).

A reasonable jury could conclude that Weaver willfully refused to provide A.W. with necessary medical care. A.W. was not breathing when Weaver called Dina and still was not breathing when she returned home 40 minutes to an hour later. "[T]he dangers inherent in such a situation could be inferred by the fact finder as a matter of common knowledge." *Duncan*, 267 Va. at 386. That is, a person in Weaver's position should have known the risk of inaction. Indeed, his own expert testified that, when someone is not breathing, the proper approach is to call 911.

Weaver emphasizes that, although he did not call 911, he called Dina, who was a pharmacist, "to seek medical advice." But merely asking for medical advice cannot be the equivalent of providing medical care when the person who asked subsequently *ignores that advice*. In *Flowers v. Commonwealth*, 49 Va. App. 241 (2007), the defendant was advised that a child in her care was "obviously on something" and that the defendant "need[ed] to go ahead and get [her] checked out." *Id.* at 244-45. Instead of calling 911, however, the defendant called the child's father, who did not live nearby, three hours after being advised that the child needed medical attention. *Id.* at 245. We held that the defendant's conduct constituted a "willful omission" that showed a reckless disregard for the child's life under Code § 18.2-371.1(B)(1). *Id.* at 248-49. And

- 18 -

we noted that the fact finder "was entitled to consider the fact that [the defendant] could have sought medical assistance for [the child] by either taking the child to a medical care provider, calling 911 for emergency services, or by promptly alerting the child's mother who lived nearby." *Id.* at 249.

Similarly, Dina advised Weaver to call 911 or take A.W. to the nearby hospital. Not only did Weaver refuse to do either, he expressly based his refusal on reasons unrelated to A.W.'s wellbeing, telling Dina that he did not want anyone to see A.W.'s bruises. Moreover, when Dina told Weaver to take A.W. to the hospital, Weaver started to reassure her that A.W. was "coming to," and persisted in those reassurances while Dina was on her way home. Given A.W.'s state when Dina finally reached him, a jury could conclude that Weaver was lying about A.W.'s state in an attempt to dissuade Dina from calling 911 herself. Finally, Weaver also would have known that he had driven Dina to work earlier in the day and that Dina could not quickly return home to assist. Based on all those facts, a jury reasonably could conclude that Weaver knew that A.W. needed medical care but chose not to provide it for a bad purpose and in reckless disregard that A.W. would suffer greater injury as a result. *See Duncan*, 267 Va. at 384 (defining willful conduct).

To convict a defendant under Code § 18.2-371.1(A), the child must "actually suffer serious injury as a result of a defendant's acts or omissions." *Wood v. Commonwealth*, 57 Va. App. 286, 298 (2010). Weaver again points to our unpublished decision in *Thompson* to argue that A.W.'s death did not result from Weaver's inaction. But *Thompson* is distinguishable. In that case, the child's injuries improved—or at least did not get worse—during the period that the defendant should have provided medical care. *Thompson*, slip op. at 2-3. Here, by contrast, a jury could conclude that A.W.'s condition deteriorated while Weaver refused to provide care. Moreover, A.W. had exhibited similar symptoms just nine days prior and was able to be revived, indicating that a similar result may again have been possible with the proper care. On these facts, the jury reasonably could conclude that Weaver willfully refused to provide necessary care and permitted

- 19 -

A.W. to suffer a serious injury as a result. Accordingly, we affirm Weaver's conviction for child neglect.

B. Sufficient evidence supports Weaver's conviction for felony murder.

Felony murder is "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those" giving rise to an aggravated or first-degree murder charge. Code § 18.2-33. Determining whether the evidence was sufficient to support Weaver's felony murder conviction "requires a two-step inquiry." *Flanders v. Commonwealth*, 298 Va. 345, 352 (2020). First, we ask whether felony child neglect "may serve as a predicate offense" for felony murder, which "presents a question of law we review de novo." *Id.* If felony child neglect is a valid predicate, we ask whether A.W.'s "death was within the res gestae" of the child neglect, applying the familiar sufficiency standard. *Id.*

Code § 18.2-33 elevates an accidental killing to second-degree murder by imputing the malice in the underlying felony to the killing. *Id.* at 357. "Thus, for a killing during the prosecution of a felonious act to constitute felony murder, there must be some malice inherent in the underlying felony." *Id.* "Implied malice 'exists where a defendant lacks the deliberate intent to kill, but the circumstances of the defendant's actions are "so harmful that the law punishes the act as though malice did in fact exist."'" *Id.* at 358 (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019)).

Malice is "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Meade v. Commonwealth*, 74 Va. App. 796, 813 (2022) (quoting *Watson-Scott*, 298 Va. at 255-56). That definition is very similar to the definition for willfulness under Code § 18.2-371.1(A), which is an act done knowingly and "without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose." *Duncan*, 267 Va. at 384. In fact, we have previously stated that "[t]he term willful is stronger than voluntary or intentional; it is

- 20 -

traditionally the equivalent of malicious, evil or corrupt." *White v. Commonwealth*, 68 Va. App. 111, 119 (2017) (emphases omitted) (quoting *Willful*, *Black's Law Dictionary* (10th ed. 2014)). Thus, "malice" is an element of felony child neglect, rendering it a valid predicate for felony murder. *Cf. Cotton v. Commonwealth*, 35 Va. App. 511, 516 (2001) (holding that felony child abuse that causes death does not merge with felony murder into a single offense).

Next, we turn to whether A.W.'s death occurred within the res gestae of Weaver's neglect. A death is within the res gestae of a predicate felony "where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise." *Flanders*, 298 Va. at 359 (quoting *Haskell v. Commonwealth*, 218 Va. 1033, 1044 (1978)). Time, place, and causal connection must all be proved to satisfy the res gestae requirement. *Id.* at 359-60. "Whether these elements are proven in a particular case is a case-specific inquiry for the fact finder to decide." *Id.* at 360.

Sufficient evidence supports all three elements. The time and place requirements are clearly met, and Weaver does not dispute them. Regarding causation, the trial court instructed the jury that it could convict Weaver if it found that his conduct was the "proximate cause" of A.W.'s death. "[I]nstructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review." *Smith v. Commonwealth*, 296 Va. 450, 461 (2018) (quoting *Wintergreen Partners, Inc. v. McGuire Woods, LLP*, 280 Va. 374, 379 (2010)). The jury instructions defined "proximate cause" as "a cause that, in natural and continuous sequence, produces the accident, injury, or damage. It is a cause without which the accident, injury, or damage would not have occurred."

A reasonable jury could conclude that Weaver's willful refusal to provide medical care was a proximate cause of A.W.'s death. As we explained in Part IV.A., A.W. had experienced a similar event shortly before his death but had been amenable to medical intervention. The evidence was

sufficient for the jury to conclude that, had Weaver taken A.W. to the hospital, A.W. would not have died.

In response, Weaver points to the "three-pronged test" derived from *Barrett v. Commonwealth*, 32 Va. App. 693 (2000). In *Barrett*, we reversed the defendant's conviction for felony murder, predicated on child neglect, after the defendant's older child drowned the defendant's younger child while the defendant slept. *Id.* at 697, 700-01.[9] In elucidating the felony murder doctrine, we explained that: (1) "only acts causing death which are committed by those involved in the felony may be the basis for a conviction"; (2) "the act causing death must result from some effort to further the felony before malice can be imputed to the act"; and (3) "there must be some act attributable to the felons which causes death." *Id.* at 700 (quoting *King v. Commonwealth*, 6 Va. App. 351, 357 (1988)). Because the older child: (1) was not involved in the defendant's felony neglect; (2) did not kill the younger child to further the defendant's felony; and (3) acted independently of the defendant, we reversed the defendant's felony murder conviction. *Id.* at 700-01.

As an initial matter, *Barrett* may be inapplicable to the extent it applied a different standard for causation than that supplied by the jury instructions. In *Barrett*, we did not use the phrase "proximate cause" and derived our felony murder causation standards from *King*. *Barrett*, 32 Va. App. at 700-01. *King* used the phrase only once, in relying on a Pennsylvania Supreme Court case that *rejected* the standard of proximate cause for felony murder. *King*, 6 Va. App. at 356 (citing *Commonwealth v. Redline*, 137 A.2d 472, 476 (Pa. 1958)). And our Supreme Court has twice declined to hold that felony murder causation is synonymous with proximate cause.

---

[9] We also reversed the defendant's child neglect conviction on the ground that the trial court erroneously refused to instruct the jury on the definition of "willful." *Barrett*, 32 Va. App. at 699. She was retried for child neglect and convicted, which the Supreme Court upheld. *Barrett v. Commonwealth*, 268 Va. 170, 186 (2004).

*Heacock v. Commonwealth*, 228 Va. 397, 404-05 (1984) (declining to reach the defendant's argument that "the felony-murder rule does not apply unless the underlying felony is shown to be the proximate cause of death"); *Wooden v. Commonwealth*, 222 Va. 758,764-65 (1981) (relying on Pennsylvania law and rejecting the Commonwealth's argument that proximate cause without malice can support a felony murder conviction). Put simply, the trial court instructed the jury on proximate cause. It did not instruct the jury on the "three-pronged test" articulated in *Barrett*.

In any event, unlike in *Barrett*, there was no third party responsible for A.W.'s death. The acts causing A.W.'s death were committed by Weaver in his attempts to further his felony child abuse and neglect. Thus, the malice from that felony could be imputed to Weaver, elevating A.W.'s accidental death to felony murder. Therefore, we affirm Weaver's felony murder conviction.

C. Sufficient evidence supports Weaver's conviction for concealing a dead body.

It is unlawful to conceal a dead body "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Code § 18.2-323.02. Code § 18.2-323.02 "adopts the ordinary meaning of 'malicious intent,'" that we discussed in Part IV.B. *Shaw v. Commonwealth*, 79 Va. App. 485, 504 (2024), *aff'd*, __ Va. __ (Apr. 17, 2025).

Weaver argues that he did not have malicious intent and that "[t]he evidence did not exclude the reasonable hypothesis that the defendant was preserving the body in a manner to conduct his own private burial." A jury easily could conclude otherwise. For one thing, the amount of time that A.W.'s remains were in the freezer—over two years—belies a claim that Weaver was keeping them there temporarily until he could bury them. Further, Dina testified that Weaver said that he did not want people to see the bruises on A.W.'s body and that they did not tell anybody that A.W. was in the freezer because they believed it to be a crime. Accordingly, there was sufficient evidence that Weaver concealed A.W.'s body with malicious intent.

## CONCLUSION

For these reasons, the circuit court's judgment is affirmed.

*Affirmed.*